**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

GLENN SPEARING MATTHEWS,        \*

        Petitioner,        \*      **CASE NO. 5:04-CV-160 WDO**
                        **28 U.S.C. § 2255**

VS.                  \*
                        **CASE NO. 5:01-CR 18 WDO**

UNITED STATES OF AMERICA,     \*

        Respondent.       \*

## REPORT AND RECOMMENDATION

A seven Count Indictment was returned to this court charging Petitioner Matthews with three Counts of Armed Bank Robbery in violation of 18 U.S.C. § 2113(a) and § 2113(d), three Counts of Use of a Firearm During a Crime of Violence in violation of 18 U.S.C. § 924(c)(1), and one Count of Possession of a Firearm by a Convicted Felon in violation of 18 U.S.C. § 922(g). (R-11). Petitioner Matthews pled not guilty to all of the charges and took his case to jury trial, which commenced on July 31, 2001 and concluded on August 1, 2001, with verdicts of guilty on all Counts. (R-41). Subsequent to the preparation and report of a Pre-Sentence Investigation (PSI) in which Petitioner Matthews was classified as a Career Criminal Offender, the court sentenced Petitioner to 300 months each on the three bank robbery offenses, 327 months on Count Seven, 120 months consecutive on Count Two, a consecutive 300 month sentence on Count Four, a consecutive 300 month sentence on Count Six, for a total term of imprisonment of 1,047 months. The Judgment was entered on November 26, 2001 (R-49), containing certain clerical errors. *See*

Sentence Transcript (R-59 at 11).   Petitioner filed an appeal of his conviction and sentence

wherein his Attorney filed an *Anders* Brief and moved to be relieved from the appeal.   The

Eleventh Circuit Court of Appeals granted the motion and, on April 28, 2003, held:

> John R. Francisco, appointed counsel for Glenn Spearing
> Matthews in this direct appeal, has moved to withdraw from
> further representation of the appellant and filed a brief pursuant
> to *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396 (1967).
> Our independent review of the entire record reveals that
> counsel's assessment of the relative merit of the appeal is
> correct.  Because independent examination of the entire record
> reveals no arguable issues of merit, counsel's motion to
> withdraw is GRANTED, and Matthews's conviction and
> sentences are AFFIRMED.

(R-70); *United States v. Matthews,* 67 Fed. Appx. 582, 2003WL21067094 (11th Cir. 2003).

On May 19, 2004, Petitioner Matthews timely filed a Motion To Vacate, Set Aside,

or Correct his Sentence Pursuant to 28 U.S.C.§ 2255 (R-71), which was so vague and

conclusory that the court ordered Petitioner to file more specific statement of his contentions

and allegations in an Amended § 2255 Motion. (R-75).   Petitioner Matthews filed his

Amended § 2255 Motion on August 23, 2004 (R-85).   The Government filed a Response

and a Motion to Dismiss. (R-87).   Factual issues were raised that required determination by

evidentiary hearing in regard to Petitioner's allegations, particularly his allegations   of

ineffective assistance of counsel.   A hearing was ordered on January 20, 2005 (R-91), and

conducted on May 24, 2005.   Transcript of that hearing ( R-95) was filed on June 22, 2005.

### Petitioner's § 2255 Claims

In his Amended § 2255 Motion, Petitioner Matthews' **Claim 1** is that his counsel did

not advise him of his sentence exposure, suggesting that he did not know what sentence range he was facing.  His **Claim 2** is that "counsel failed to explain the government's plea offer in context of applicable law and facts." Petitioner Matthews states, "Counsel's failure to properly advise movant as to sentence exposure caused movant to reject a plea offer made by the government." He adds, "Movant went to trial believing that the maximum sentence he could receive from a guilty verdict as charged was forty-five (45) years."  (R-85 at 1,2).

First, the record contradicts Petitioner's contention.  At initial appearance before a United States Magistrate Judge, Petitioner Matthews was given a Notice of Sentencing Guidelines Range in his case which specified a range, upon conviction, of from 360 months imprisonment to life (R-14), which Petitioner acknowledged at hearing. (R-95 at 26). Further, at the hearing on May 24, 2005, Attorney John Francisco testified that he "explained the sentencing structure that he (Petitioner Matthews) was facing based on the bank robbery charges and the firearms charges . . . provided him a copy of the sentencing tables . . . went over the sentencing tables with him . . . went over the written plea agreement with Mr. Matthews . . . several times . . . (advised him)  the  sentence offer was 30 plus five, a total of 35  years . . . explained to him that he could face potentially, at least 60 years alone on the firearm charges if he went to trial."  (R-95 at 40, 41).

At the May 24th hearing, Petitioner Matthews' hearing counsel asked him, "did Mr. Francisco ever explain to you what the charges were against you and what you faced in terms of a sentence if you went to trial?"  Matthews, being less than responsive, answered,

"[H]e asked me would I plead out to 12 years, and I told him I would, and he said, I'll get back with you. . . .[W]hen I got back to Macon, he told me the D A, Mr. Fox, said plea out to 35 years.  I said, why I got to plea out to 35 years for, and he said, they talking about giving you 45, 60.  So I said, what's the difference." (R-95 at 5, 6).  Hearing Counsel asked, "Well, Mr. Matthews, did you ever finally reject any plea offer made by the government?" He answered, "No, ma'am.  Because I really don't know nothing about law.  . . .  That was Mr. John Frisco('s) decision." (R-95 at 8,9).

Hearing counsel then asked, "Now, you contend that you were not aware of any plea offer that was made by the government  – can you explain that to the court?"  Petitioner Matthews answered, "Only thing Mr. John was telling me is to plea out with the deal Mr. Fox was telling him, . . . and I told him I'm sorry if I made him  upset, but I couldn't plea out to no 35.  He was telling me 45 was the max."  On cross-examination, in response to a question as to whether he had rejected a plea agreement for 35 years, Petitioner responded, "He (Mr. Francisco) told me I was looking at 45 if I took it to the jury, and the 35 is no deal to 45." (R-27).

Attorney Francisco testified that the government never made an offer of 12 years; that Mr. Matthews asked for a 10 year sentence; that when the government rejected that request, Petitioner  then asked whether or not he could get a 12 year sentence; that the government offered a written plea agreement for a 35 year sentence, which he went over with Mr. Matthews several times; that Mr. Matthews declined the government's offer against his

advice and went to a jury trial against his advice; and, that the decision to go to trial was "absolutely" Mr. Matthews' decision alone.  (R95 at 40, 41).  Attorney Francisco recounted the circumstances that, "Mr. Matthews (had) first confessed the three bank robberies to approximately 350 people at The Comedy Café (Trial Tr. at 129-135).  He then confessed to various family members, employers, and to the police."  On cross, Attorney Francisco stated, "I told him there was no reason basically (to go to trial).  He needed to plea out, specifically in the fact that all he wanted to do was to tell the jury and tell the people that he was sorry and he thought he should get a 10 year sentence."  (R-95 at 39, 41).

Petitioner's claims that he was not advised of his sentencing exposure and that the offered plea agreement for a 35 year sentence was not effectively explained to him is contrary to the record and unsupported by any competent evidence.  Petitioner's own testimony regarding sentence exposure reveals that he knew the maximum possible sentence he faced was life imprisonment.[1]  His testimony in regard to the 35 year plea agreement reveals that he was of the opinion that there was no difference between 35 and 45years ,nor apparently 60 or more.  His hearing statement that the decision to go to trial was his attorney's decision is shown to be disingenuous in face of the record and his own testimony.

In his **13th** and **16th** claim, which are connected to his sentence claims of ineffective assistance of counsel, Matthews contends that defense counsel failed to object to sentencing

---

[1] In his Traverse to Government's Response (R-89 at 2) Petitioner Matthews states, "While Petitioner will accept that he was advised in open court that he potentially could receive 360 months to life if convicted . . . under the law, petitioner did not face a life sentence, . . ."  It must be noted that Petitioner did not receive a life sentence, and he makes no claim  that he did not faceo the sentence he actually got, or something near thereto.

issues, specifically that he failed to object to Petitioner being classified as an armed career offender under 18 U.S.C. § 924(e), relative to his sentence on Count Seven of the Indictment. See U.S.S.G. § 4B1.4.

The Sentence on Count Seven was, in fact, erroneously calculated as an Armed Career Criminal sentence under 18 U.S.C. § 924(e)( 1). Although the Government filed a Notice Specifying Glenn Spearing Matthews As An Armed Career Criminal on July 23, 2001 (R-34), no competent evidence as to three prior violent felonies or qualifying drug offenses was ever submitted to the court as required to invoke the enhanced penalties prescribed by 18 U.S.C. § 924(e). AUSA Fox conceded in his response to Petitioner's Amended § 2255 Motion that:

> While the Government sought to establish the Defendant as an armed career offender (R-34), it was unsuccessful in its attempt. At to possession of a firearm by a convicted felon (Count Seven), the Defendant was sentenced in accordance with 18 U.S.C. § 924(a)(2), not § 924(e).

(R-87 at 18). The Government's assessment that the armed career offender status had not been established is correct from the evidence of record or lack thereof. AUSA Fox, however, failed to withdraw his Notice of Armed Career Criminal (R-34), and failed to advise the Probation Department or the Court that the provisions of the Armed Career Criminal Act as codified at 18 U.S.C. § 924(e) should not apply to the sentence calculation as to Petitioner's Count Seven conviction. Petitioner's counsel also failed to object to the sentence on Count Seven being calculated and pronounced under the Armed Career Criminal status. The

sentence on Count Seven should have been calculated and pronounced under § 924 (a)(2), as AUSA Fox now supposes it was, the maximum of which was and is "not more than 10 years."   The AUSA  is mistaken that Petitioner Matthews was sentenced on Count Seven under § 924(a)(2). See  (R-49) and Petitioner's PSI.

Petitioner Matthews also claims in his Traverse (R-89) to the Government's Response that the sentence on the Count Seven conviction was a consecutive sentence.  Petitioner Matthews is mistaken. Contrary to Petitioner's contention, the sentence imposed by the court as to Count 7 of the Indictment, Possession of a Firearm By a Convicted Felon, was not made to run consecutive to any other sentence he received in this case. See (R-49).   Title 18, U.S.C. § 3584(a) provides that, "Multiple terms of imprisonment imposed at the same time run concurrently unless the court orders or the statute mandates that the terms are to run consecutively."  Neither 18 U.S.C. § 924(a) or (e) mandates a consecutive sentence, nor did the sentencing judge order that the sentence pronounced as to Count 7 run consecutive to any other sentence pronounced in this case.  At page 11 of the Sentencing Transcript (R-59), the court pronounced Petitioner's sentences as follows:

> Now, the Court then is going to commit you to the Bureau of Prisons for *300* months on Counts One, Three, and Five, *and on Count Seven for a period of 327 months.*

> Count Two requires a mandatory sentence of 120 months *consecutive to all other counts*.

> Counts Four and Six each require a mandatory 300 months sentence *consecutive to each other and to all other counts*, for a total sentence of imprisonment of 1, 047 months.

That sentence will be served consecutive to the state parole
revocation sentence that you are not serving. (emphasis added).

The calculation of the total term of the sentences as pronounced on November 7,
2001, and as reflected in the Judgment (R49), is:

300 months imprisonment on Counts One, Three, and Five and
327 months on Count Seven, *running concurrently*, rendering a
327 month sub-total; plus

120 months on Count Two *statutorily consecutive* to all other
counts, rendering a
447 month cumulative sub-total; plus

300 months imprisonment on *each* of Counts Four and Six,
statutorily consecutive *to each other and to all other counts*,
rendering an additional 600 months consecutive imprisonment
for the 1,047 months total sentence.

Therefore, Petitioner's 327 month sentences on Counts One, Three, and Five, as

reflected in the Judgment (R-49), were clerical errors which should be corrected  pursuant

to Rule 60(a), Federal Rules of Civil Procedure, to 300 months each, as actually pronounced.

(R-49 at 11).  Petitioner Matthews sentence on Count Seven should be corrected to the "no

more than 10 years" maximum term provided in 18 U.S.C. § 924(a)(2).  Since the sentence

on Count Seven was, by law, concurrent with the 300 month sentences on Counts One,

Three, and Five, the net result would be a reduction of twenty-seven (27) months in

Petitioner's sentence on Counts One, Three, Five and Seven, whether the Count Seven

sentence is corrected to the maximum 120 months or any lesser term.   It is also

recommended that the PSI calculations as to the Count Seven sentence be corrected to comply with the maximum penalty prescribed by § 924(a)(2), as applicable to Petitioner's case.

Petitioner's **Claims 3** and **5,** are inter-related claims of ineffective assistance of counsel.  In his Amended § 2255 Motion, Claim 3, Petitioner Matthews states:

> Movant was lead to believe that he had a viable defense strategy that was supported by the facts and the law.  Counsel told movant that a defense against the charges would be made at trial based on the "crying-out-for- help" defense.  That is, counsel allowed movant to believe that he could escape criminal liability and/or punishment by showing the jury that his actions were a way of seeking psychological help.

In Claim 5, Petitioner contends that:

> Counsel failed to properly advise movant about testifying, and erroneously advised movant that conceding guilt on the stand was a necessary component of his "crying-out-for-help" defense.

Petitioner's claims that the decision to go to trial rather than to take the Government's Plea Agreement offer was his attorney's has been shown to be disingenuous in the discussion  of the record and testimony as to Petitioner's Claims One and Two above. Petitioner's claim that his counsel "allowed" him to go to trial with an implausible defense is just as disingenuous and incredulous.  The record indicates that defense counsel was helpless to stop him.

When asked at the Petitioner's § 2255 hearing whether Petitioner Matthews was "aware that he could face potentially 60 years alone on the firearms charges, if he went to

9

trial," Defense Attorney Francisco answered, "Yes.  Or at least I explained it to him."  Then

in response to the question whether it was Mr. Matthews' decision alone to go to trial,

Attorney Francisco answered, "Absolutely his decision. . . . I told him there was no reason

basically (to go to trial).  He needed to plea out, specifically in the fact that all he wanted to

do was to tell the jury and tell the people that he was sorry and he thought he should get a

10 year sentence."  (R-95 at 39, 41).   Petitioner Matthews chose to speak directly to the

District Judge at sentencing, and his statement substantiates Attorney Francisco's testimony.

Petitioner Matthews stated:

> I asked Mr. Frisco  – – me and the D A here, had a few words,
> he asked me to plead guilty about three times . . . I told Mr.
> Frisco to tell him that I was sorry, and I think you asked me
> about twice, but what I wanted to do was to get in front of the
> jury and let the people know that I was very sorry about what I
> did, thank God didn't no one get hurt . . .  I really wasn't trying
> to beat the case. . . . I changed.  That's what I wanted to tell the
> jury and the people in the bank.  I changed, and I'm sorry about
> what happened, you know, but when that devil get in you, I
> came to y'all for help, I wanted help, I'm not concerned about
> doing nothing like that. . . . And I wanted to let the jury know
> that I changed.  I didn't take the case to the jury to try to beat no
> case.  I took the case to the jury because if I would've pleaded
> out, which as all y'all tried to get me to plea, I said the people
> will never get to see me.  The only thing they'll see is a picture
> of me.  I didn't try to beat the case.  I confessed to the case
> before the tape even got there, and I just changed. Everybody
> change, you know. . . . They say, I had high blood pressure, the
> alcohol I was drinking was eating my liver up.

Sentencing Transcript, (R-59 at 7, 8).  Petitioner Matthews testified at the § 2255 hearing

that, "At the time (of the bank robberies) I was up under the influence, drugs . . . Yes, sir.

10

Alcohol.  They say the alcohol was eating my liver up, and I'm drinking it like it was water."

(R-95 at 23).


At the § 2255 hearing on May 24, 2005 (R-95 at 39), Mr. Francisco testified in

response to "whether Petitioner testified according to your advice or against it"that**:**

> It was against my advise. . . . . Mr. Matthews first confessed to
> approximately 350 people at the Comedy Club.  He then
> confessed to various family members, employers, and to the
> police.  That was also on tape.  He had all of that to review.
> There was nothing to gain by his testifying.  I told him that.  I
> told him it was his constitutional right not to testify, but if he
> chose to testify, he could.  I asked him what he wanted to say.
> He said he wanted to tell the people, particularly the ladies from
> the bank, that he was sorry for robbing the bank and causing
> them distress, and it was totally against my advice.

At trial, the Court advised Petitioner Matthews as to his right to testify, stating:

> Mr. Matthews. . . after lunch it will be your opportunity to
> present evidence if you wish to do so and your opportunity to
> testify if you wish to do so.  You have an absolute right to
> present evidence, an absolute right to testify.  You cannot be
> compelled to do either.  It's up to you as to whether you wish
> to present evidence or testify.  You can rely upon Mr.
> Francisco's advice, but you do not have to do what he
> suggests.  That's strictly up to you.  Do you have any
> questions about what I've explained?
>
> THE DEFENDANT:    No, Sir.
>
> THE COURT:   All right.  We're going to give you a form
> which we ask you to sign. And on that form, there's a place
> for you to elect to either testify or not testify.
>
> MR. FRANCISCO:   Mr. Matthews has elected to testify, Your Honor.

11

(Trial Transcript, R-57 at 187, 188).   Petitioner Matthews testified as follows:

> Well, you know, I'm very sorry about what I did.  I got
> married.  We got two children.  And I told my wife I was
> getting – – I had a very bad problem and I wanted to tell her,
> and I told her what I did.  I told her I was going to turn
> myself in, that I wanted to see my two children and be with
> them.  But, you know, if y'all find me guilty, I'll never see
> them no more.  And I want to get it over with and go on with
> my life.  I didn't never intend to hurt no one.  I think I stayed
> in all three of them (banks) no more than ten seconds.  I was
> scared-er than anybody in the bank.  But I had a problem.

(Trial Tr., R-57 at 198).   Most telling on whether Attorney Francisco advised Petitioner

Matthews to go to trial and testify as he did is the concluding colloquy between

Petitioner Matthews and the Government's attorney at the § 2255 hearing (R-95 at 34,

35):

> Q.  Mr. Matthews, is there one thing that you can name that
> Mr. Francisco didn't do that would have changed the verdict
> that was rendered against you in this court?
>
> A.  I would have pleaded out if he'd let me plead out to 12
> years, Mr. Fox, but Mr. Francisco, all he did was told me to
> plea out.

In his **Claim 4**, Petitioner states:

> During the prosecutor's closing statements the prosecutor
> ridiculed movant's "crying-out-for-help" defense and
> generally belittled movant's attempt at making a defense
> based on his seeking help.

Petitioner's Claim 4 fails to state a claim under 28 U.S.C. § 2255 upon which this

court can grant relief.  See 28 U.S.C. § 2255, ¶ 1.  Petitioner Matthews chose to testify

12

and his testimony became subject to fair comment by the prosecutor.

The Eleventh Circuit Court of Appeals set out the standard for constitutional claims of prosecutorial misconduct in closing argument in *Brooks v. Kemp,* 762 F.2d 1383, 1399-1403 (11th Cir. 1985), to-wit:

> We relied on the Supreme Court case *Donnelly v. DeChristoforo,* 416 U.S. 637, 645, 94 S.Ct. 1868, 1872 (1974), which held that a prosecutor's argument violates the Constitution if it renders the defendant's trial "so fundamentally unfair as to deny him due process." Improper argument by a prosecutor reaches this threshold of fundamental unfairness if it is "so egregious as to create a reasonable probability that the outcome was changed." *Id.* at 1403. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068 (1984). Thus, the defendant must show a reasonable probability that, but for the prosecutor's statements, the result of the proceeding would have been different.

*Brooks,* 762 F.2d at 1401-02. See *Davis v. Zant,* 36 F.3d 1538, 1546 (11th Cir. 1994). *Brooks* indicates that a court should first determine whether the remarks made by the prosecutor were in fact improper, and only then turn to the issue of whether fundamental fairness was denied. *Davis,* 36 F.3d at 1548.

After summarizing the very extensive amount of evidence the Government had produced, aside from Petitioner Matthews' trial testimony,

AUSA Fox stated in his closing argument to the jury:

> [H]e was running it like a business. This was not a man crying for help. No, this was a gentleman who was in the bank robbery business. . . . This wasn't a man crying for help. This was a man who had it well thought out ahead of time. And I submit to

13

> you, ladies and gentlemen, that he would still be in business
> robbing banks if it hadn't been for a man walking his dog who
> saw him throwing the bike in the back of his van, and it was
> only then that he realized that he had been identified that he
> decided to give up this life of crime.

(R-66 at 6, 8).  Petitioner has shown nothing improper or unconstitutional about Government

counsel's remarks to the jury.  Petitioner testified that he had robbed three banks because he

had drug, alcohol, and marital problems, and he was crying out for help in that way.

Government counsel addressed the systematic and business-like manner in which Petitioner

prepared for and succeeded in robbing the three banks.  His comments did not exceed fair

comment on the evidence and did not approach the level of fundamental unfairness or denial

of due process.

In **Claim 6,** Petitioner Matthews asserts a *Batson* violation in a very cursory manner.

He states, "Movant contends that the peremptory strikes (were) used by the prosecutor at

persons of minority.  Specifically, the prosecutor struck the following perspective Jurors, Tr.

Vol. 7/31/01, pgs. 28-32."  Petitioner does not state which of the juror stricken by the

prosecutor were minority, nor does he assert any racial motivation.  No *Batson* objection was

made, and Petitioner makes no claim of ineffective assistance of counsel in that regard.  The

prosecutor and defense counsel stipulated to the court outside the presence of the jury,

immediately before the trial began, that there were no *Batson* challenges and there were "in

this jury, three black individuals, which is approximately the racial makeup in the Middle

Georgia area." (R-57 at 6).

14

At hearing, the *only* evidence Petitioner Matthews proffered to support his *Batson* violation claim was his testimony on cross-examination that, "I didn't see but one black on the jury.  He was going to sleep. I wished he'd've woke up."   Petitioner makes no further effort to support this claim.  He has failed to raise a cognizable *Batson* violationt.  "In *Batson,* the United States Supreme Court established a three-step test for evaluating claims of racial discrimination in jury selection.  The defendant must first establish a prima facie case by producing evidence sufficient to support the inference that the prosecutor exercised peremptory challenges on the basis of race.  *Johnson v. California,* — U.S.– , 125 S.Ct. 2410 (2005); *Batson,* 476 U.S. at 96, 106 S.Ct. at 1723.*" McNair v. Campbell,* 2005WL 1634046 (11th Cir.  2005).

Petitioner Matthews withdraws his **Claim 7** in his Amended Motion (R-85 at 4).

Petitioner's **Claim 8 "***argues***"** that:

> [T]he federal government does not have jurisdiction to prosecute individually for possession of a firearm when that possession does not have a substantial effect on interstate commerce.  U.S. v. Coward, 151 F. Supp. (E.D. Pa. 2001); *Lopez/Morrison* seems to hold that simple possession of a firearm is not a federal offense."

(R-85 at 4).  In *United States v. Clay,* 355 F.3d 1281 (11th Cir.  2004), our Circuit Court of Appeals clarified the federal nexus for prosecution of a convicted felon for possession of a firearm made outside the State in which it was possessed.  At 1286-87, the *Clay* Court held:

> Section 922(g)(1) states that it is unlawful for any convicted felon to "possess in or affecting commerce, any firearm."  This Court has held that the "possess in or affecting commerce"

portion of § 922(g)(1) is a jurisdictional element of the criminal offense. *See United States v. McAllister,* 77 F.3d 387, 390 (11th Cir. 2001), . . . *McAllister* requires the government to demonstrate that the firearm possessed traveled in interstate commerce." *Id.* at 1274. . . .

We have stated that a weapon which was seized in Florida and "bore an imprint indicating that it had been manufactured in Atlanta"gave a "clear indication of interstate commerce." *United States v. Brantley,* 68 F.3d 1283, 1288 (11th Cir. 1995); . . . *see also United States v. Gourley,* 835 F.2d 249, 251 (10th Cir. 1987) (proof that firearm was manufactured outside the state in which the possession occurred is sufficient to support a finding that the possession was "in or affected commerce."

*See also United States v. Dupree,* 258 F.3d 1258 (11th Cir. 2001) (deciding that *United States v. Morrison,* 529 U.S. 598, 120 S.Ct. 1740 (2000) "does not change the holding in *McAllister* and that § 922(g) is a constitutional exercise of Congress's commerce power").

The *Dupree* Court also distinguished *United States v. Lopez,* 514 U.S. 549, (1995), at 1259:

In *Lopez,* the Supreme Court relied on the fact that the Gun Free School Act "by its terms had nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Lopez,* at 561, 115 S.Ct. At 1630-31. . . . In contrast, § 922(g) is an attempt to regulate guns that have a connection to interstate commerce; . . . It is this jurisdictional element to § 922(g) that distinguishes it from the Gun Free Schools Act and, accordingly, the holding in *Lopez.*

The Government's witness Gary Kubach testified at Petitioner's trial that the firearm in question and placed into evidence, "like all Rugers, has the trade-name stamped on it, and it has the home office stamping of Southport, Connecticut stamped on the barrel. But these particular weapons are made, like all their kind, in Newport, New Hampshire. Strum Ruger is one of several companies that has multiple factories about the nation . . . . So the home

office that's stamped on there shows Southport, Connecticut, but the weapon is actually made in Newport, New Hampshire."  (R-57 at 158).

The Government met its burden of proving the interstate commerce nexus and Petitioner's challenge to the federal jurisdiction as to his possession of the firearm in his Claim 8, contending that "had counsel objected at appropriate times, petitioner would not have any sentence on this non-federal crime", is without merit.

In Part Two of Petitioner's challenge to the federal jurisdiction, as revived in his Traverse to Government's Response (R-89 at 7), Matthews challenges this court's jurisdiction to the bank robberies charged in his indictment under 18 U.S.C. § 2113.  He states, "First, there is no question that FDIC insures for bankruptcy (and naturalization) under Art. I, § 8, cl.4.   Petitioner also contends that FDIC insurance does not cover theft or robbery.  He argues, "There is no jurisdictional hook within Section 2113 unless the bank is a federal bank (Section 2113(f)).  Thus, there is no federal offense if there is no jurisdictional element to grant federal jurisdiction."   Bankruptcy and Naturalization aside, the issue is whether the federal district court had jurisdiction to try the bank robbery cases charged against Petitioner Matthews.

The Eleventh Circuit Court of Appeals' precedent for the establishment of federal jurisdiction to prosecute the robbery of banks insured by the Federal Deposit Insurance Corporation (FDIC) precedes the establishment of the Eleventh Circuit.  In *United States v.*

17

*Manor,* 611 F.2d 107 (5th Cir. 1980),[2] the Court stated that, "To establish federal jurisdiction

and to prove a violation of § 2113, the Government must show that the bank was insured by

the FDIC at the time of the robbery." *See United States v. Bizzard,* 674 F.2d 1382, 1386 (11th

Cir. 1982)(same).  The Government's proof in Petitioner Matthews' case consisted, first, of

the testimony of Mark Rogers, a Vice-President of the First Union Bank, which was twice

robbed as charged in Petitioner's indictment, who produced into evidence at Petitioner's trial,

the FDIC certificate, and verified federal insurance on the First Union Bank on the day of the

robbery.  (R57 at 27-29).  Secondly, Government's witness Sue Blocker, the Area Operations

Officer of the BB&T bank, the victim bank in the other robbery charged in Petitioner's

indictment, produced into evidence the FDIC certificate in effect at the time of the robbery

there. (R-57 at 69-71).

Petitioner's general claim of ineffective assistance of counsel for failure to object at

appropriate times does not apply to the proof of FDIC coverage on the banks.  The Eleventh

Circuit Court of Appeals, in *Poole v. United States,* 832 F.2d 561, 564 (11th Cir.  1987),

*certiorari denied,* 488 U.S. 817, 109 S.Ct. 54 (1988), held:

> [C]ounsel for the defendant can stipulate to the insured status of
> the banks without a formal waiver by the defendant.  . . .  It is
> often wise for counsel to stipulate to such trivial and easily
> proven matters as to whether banks were federally insured at the
> time of the robbery.   Courts have even encouraged such
> stipulations.

---

[2]  In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir. 1981) *en banc,* the 11th Circuit Court
of Appeals adopted as precedent the decisions of the Former Fifth Circuit issued before October 1, 1981.

18

If defense counsel cannot be found ineffective for *stipulating* to FDIC insurance, his decision not to object to the actual proof of FDIC insurance comes less near making him so.

Petitioner unifies his **Claims 9, 15,** and **17** in his Amended Motion (R-85) alleging:

> [C]ounsel failed to, among other things, preserve for appellate review the district court's adverse evidentiary ruling when Capt. Gibson testified to what movant's wife said about movant's involvement in bank robbery.  (Tr. Vol. 7/17/01, pp. 11-14). This was clearly a violation of spousal privilege; not to mention hearsay.  Additionally, counsel failed to object when Capt. Gibson gave testimony as to what movant told him during interrogation.  That did not comply with movant's right to counsel or his right to remain silent.

At Claim 15, Petitioner states only that the "issue is developed more fully under issue No. 9.  At Claim 17, Petitioner Matthews adds:

> Movant alleges that counsel failed to effectively investigate, develop, argue, or preserve issues related to violation of marital privilege by law enforcement officers (Capt. Gibson).  Gibson is the grandfather of movant's wife's son, and based on this family relationship Capt. Gibson was able to procure incriminating information from movant's wife.  This information was gained in violation of the constitution and concepts of marital privilege.

Petitioner's reference to pages 11-24 of a Trial Volume transcript actually refers to the transcript of his Motion To Suppress hearing (R-58, pp.11-24), the testimony of Capt. Henry Gibson.  While Capt. Gibson did testify at the Motion To Suppress hearing that Mrs. Matthews, Petitioner's wife, had called him and engaged him in a conversation in which she said, " I believe Glenn is the bank robber", he did not testify at Petitioner's trial as to any

19

conversation with Mrs. Matthews.  He testified at trial only that he had a conversation with Petitioner Matthews on January 18th at his office, which was initiated by Matthews, and that he saw that he was given his Miranda rights and turned him over to Detective Andrea Grinstead. At trial, Capt. Gibson testified to no confession made by Petitioner or any incrimination of Petitioner  by Mrs. Matthews.  (R-57 at 162-64).

It should also be noted that apparently Mrs. Matthews exercised her spousal privilege not to testify against her husband and did not testify at his trial.  To the extent of keeping incriminating statements made by Mrs. Matthews out of Petitioner's trial, defense counsel was successful with his Motion To Suppress. (R-33).

Petitioner claims that his "counsel should have challenged the legality of evidence procured by way of information gleaned from conversations with the movant's wife (Tricia Jarrell Matthews)" and the facts and evidence procured by Capt. Gibson from Petitioner's wife "after failing to advise movant's wife of marital privilege."  Petitioner Matthews misunderstands the *spousal privilege,* and his reliance of *Trammel v. United States,* 445 U.S. 40, 100 S.Ct. 906 (1980) is misplaced.

First, the spousal privilege, and Rule 501 privileges and immunities, are testimonial exclusionary rules.  The witness-spouse alone has the privilege to refuse to testify adversely and may neither be compelled to testify nor foreclosed from testifying.  That is *spousal privilege.*  In Petitioner's case, his wife exercised her privilege and did not testify against him.  Secondly, her pretrial statements to any law-enforcement officers, which might have

led to evidence of Petitioner's guilt of the bank robberies, were not ever precluded by any rule of privilege.  The *Trammel*  Court ruling is inapposite to Petitioner's contention that evidence obtained as the result  of pretrial statements made by his wife should be suppressed under the spousal privilege.  Her conduct or statements are treated the same as those of any other person interviewed in a criminal investigation.   The *Trammel* Court at 52 held:

> [W]e conclude that the existing rule should be modified  so that the witness-spouse alone has a privilege to refuse to testify adversely; the witness may be neither compelled to testify nor foreclosed from testifying.  This modification – vesting the privilege in the witness-spouse  – furthers the important public interest in marital harmony without unduly burdening legitimate law enforcement needs.

At all times, Mrs. Matthews was free to talk to the police, or not, about any thing she knew about the criminal offenses under investigation, and, under the *spousal privilege* to testify or not adversely to her husband.  The privilege does not extend to confidential spousal communications.  "The ancient foundations for so sweeping a privilege have long since disappeared." *Trammel,* 445 U. S. at 52.

There is no merit in Petitioner's spousal privilege claims as to testimony or evidence obtained, and his counsel was not ineffective for failing to make meritless objections.  *See Alvord v. Wainright,* 725 F.2d 1282, 1291 (11th Cir. 1984).

Petitioner Matthew infers in **Claim 9** and **Claim 19** that his Miranda rights were violated by Captain Gibson.  The record indicates to the contrary.  At Petitioner's Motion

to Suppress hearing (R-58), Capt. Henry Gibson testified that on January 18, 2001, in the

presence of Mrs. Matthews, Mr. Matthews was allowed in, and that:

> [T]he conversation went on to him stating that when he went to
> the Comedy Club, that he was feeling guilty.  At some point
> during the conversation, just prior to him committing himself to
> say anything positive, I told him that before he could go any
> further I needed to get him Miranda-ized.  I needed to have one
> of the detectives that was working the case to come in and read
> him his rights.  And I told him that, you know, that he needed
> to go ahead and tell the truth, but this was something that had
> to be done to protect his rights. And that was done by Detective
> Grinstead. . . . I was not present when he gave the statements.

 (R-58 at 18, 19). On cross-examination, Capt. Gibson testified at the Motion to Suppress

hearing that:

> I didn't start talking to him.  As I stated, he started talking to
> me. . . . After he stated to me, I believe, that he started to call
> me. And as far as the statement about going to the Comedy
> Club and what transpired out there, at that point, I stopped him
> and told him that he had to be advised of his rights, well-
> advised of his rights before he talked to me, that he's already
> asked for an attorney, that I could not talk to him without him
> being advised.

It should be noted that Capt. Gibson never testified that Petitioner Matthews made

a confession to him, neither at the Motion To Suppress hearing nor at trial.   Petitioner's

claim of a Miranda violation is unfounded.  He initiated the conversations and made

statements freely and voluntarily, waiving the presence of the attorney he had previously

requested. It should also be noted that he had made so many pre-arrest statements of guilt

to other persons who testified in the case, that there was no need for any statement he may

have made to Capt. Gibson, and none was presented.  If any error was committed in allowing him to initiate and engage in conversation with Capt. Gibson, in view of the overwhelming evidence against him, such error was harmless.  It should also be noted that at the § 2255 hearing on May 24, 2005, Petitioner Matthews made no mention of any concern over Miranda violations.

In his Amended **Claims 10 and 12,** Petitioner Matthews contends that his "counsel failed to provide effective representation related to his competency issues.  Specifically, counsel failed to get an independent psychiatrist, did not adequately litigate the issue of competency, and failed to preserve the district court's ruling on competency.

As shown in prior claims addressed, Petitioner related that during the period of the commissions of the offenses charged, he was having serious marital problems, that he was drinking alcohol like it was water, and doing drugs, marijuana and cocaine specifically. At no time heretofore has he raised any claim that would sound of an insanity defense.  He fails to note the fact that his attorney moved the court for a pretrial psychiatric examination (R-8) and got it.  The report found petitioner to be competent. (R-57).  In the cool light of sobriety, no doubt Petitioner now concludes that he was "crazy" to have committed three bank robberies and then to have confessed publicly and privately at will.  Voluntary intoxication does not equate insanity and is no excuse for the commission of crime, nor can counsel be found ineffective for not going down that path.  *See Hill v. Moore,* 175 F.3d 915 (11th Cir. 1999); *Lobosco v. Thomas,* 928 F.2d 1054 (11th Cir. 1991).  Petitioner does not suggest any

reasonable probability that his case would have resulted differently had counsel sought a second psychiatric opinion. He was not entitled to "fish" for an independent psychiatrist to his liking. *U. S. v. Adler,* 767 F.2d 314, 318 (7th Cir. 1984).

In his Amended Motion **Claim 11,** Petitioner Matthews asserts that "counsel was ineffective for failing to properly pursue a plea agreement that would allow movant credit for *acceptance of responsibility.* This claim is ancillary to his original § 2255 claim that his counsel was ineffective for "not getting him a better plea deal from the Government." He adds, "Movant was willing to accept . . . any other sentence up to and including twenty-five years." It should be noted that the Government's 35 year "deal" included an acceptance of responsibility credit. Effective assistance of counsel does not require counsel to perform magic and make the Government agree to absurd plea bargains. Petitioner committed three bank robberies with a semi-automatic weapon, which he fired into the ceiling of each bank, apparently to impress the bank personnel so that he might the more efficiently rob them. He obviously acted alone, and he circulated confessions widely. The Government had no reason to urge a Rule 35 Motion for Reduction of Sentence, or recommend below guideline range sentencing. Defense counsel was at the mercy of a "slam-dunk" case in the hands of the Government and a client who insisted on going to trial so that he could apologize to the bank employees for what he had done, all as shown heretofore. He concludes his **Claim 11** with the following statement:

> For the record movant did not want to go to trial, because he was guilty of the bank robbery and only wanted to accept his

responsibility accordingly.

It has been shown heretofore from the record and additional hearing testimony that Petitioner insisted on going to trial, unless the Government agreed to a 12 year sentence, which in Petitioner's judgment was sufficient for the changed man that he had become. Petitioner's Claim 11 is frivolous.  Furthermore, it fails to state a cognizable issue under 28 U.S.C. § 2255, ¶ 1.

In **Claim 14** of his Amended Motion, Petitioner reasserts his contention that his counsel was ineffective for conceding movant's guilt at trial.   Petitioner seeks to have everything both ways.  As has been shown heretofore, Petitioner would not consider the Government Plea Agreement for 35 years; he made the decision to go to trial, telling his counsel that he wanted to apologize to the bank employees; he has repeated that he was not trying to beat the charges, he wanted to be heard.  He left counsel no choice but to concede Petitioner's guilt.  Petitioner's conduct begins to be revealed for what it was.  It was ***his*** strategic decision to speak to the trial judge every chance he got before, during and after trial, to testify at trial to apologize for what he had done and to urge that he was a changed man, for the benefit of the judge who would ultimately sentence him.  He showed the judge his children's pictures at the sentencing hearing.  It becomes clear that the strategy to go to trial to concede guilt in a case that was hopeless for him to win in face of such over whelming evidence, was for the favorable impression Petitioner hoped to have on the sentencing judge. All of Petitioner's choices were made for a hopefully advantageous effect on the trial judge.

25

Petitioner and his counsel knew that there was nothing to be gained from the jury.  Petitioner tried strategically to move the sentencing judge to do what neither he nor his counsel could get the Government to do, and that was to lower his sentence below 35 years.  The trial judge did not buy it.  So Petitioner now seeks to blame the counsel, whom he had rendered helpless in his case by not taking his wise counsel as to the Plea Bargain which the  Government offered, and which now appears  generous  to all.

Finally, the Eleventh Circuit Court of Appeals, on Petitioner's direct appeal, in the face of counsel's *Ander's* Motion, reviewed Petitioner's entire record and made the following findings:

> Our independent review of the entire record reveals that counsel's assessment of the relative merit of the appeal is correct.  Because independent examination of the entire record reveals no arguable issues of merit, counsel's motion to withdraw is GRANTED, and Matthews conviction and sentences are AFFIRMED.

(R-70); United States v. Matthews, 67 Fed. ppx. 582, 2003WL21067094 (11th Cir.2003).

The Eleventh Circuit Court of Appeals held in *United States v. Nyhuis,* 211 F.3d 1340, 1343(11th Cir. 2000):

> The district court is not required to reconsider claims of error that were raised and disposed of on direct appeal. *United States v. Rowa,* 663 F.2d 1034, 1035 (11th Cir. 1981).  "[O]nce a matter has been decided adversely to a defendant on direct appeal it cannot be re-litigated in a collateral attack under section 2255." *United States v Natelli,* 553 F.2d 5, 7 (2nd Cir. 1997).

Petitioner Matthews has failed to carry the heavy burden of his ineffective assistance of counsel claims.   The Court held in *Rogers v. Zant,* 13 F.3d 384,486 (11th Cir. 1994):

> The cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between.   "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 2064 (1984). To establish prejudice, the Petitioner must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Id.* at 694..... When reviewing whether an attorney is ineffective, courts "should always presume strongly that counsel's performance was reasonable and adequate." *Atkins v. Singletary*, 965 F. 2d 952, 958 (11th Cir. 1992). And, "a court should be highly deferential to those choices ... that are arguably dictated by a reasonable trial strategy." *Devier v. Zant*, 3 F.3d 1445, 1450 (11th Cir. 1993). Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so.  This burden, which is petitioner's to bear, is and is supposed to be a heavy one.

WHEREFORE, IT IS RECOMMENDED for all of the foregoing reasons and upon all of the foregoing authority, that Petitioner's Motion To Vacate, Set Aside, or Correct his Sentence Pursuant to 28 U.S.C.§ 2255 be DENIED, with the exception that his sentences on Counts One, Three,  Five, and Seven, be corrected as specified above.  For the necessity of those clerical corrections to Petitioner's sentences, Respondent's Motion To Dismiss should

be DENIED.  Pursuant to 28 U.S.C. § 636 (b)(1), Petitioner may serve and file written

objections to this Recommendation with the UNITED STATES DISTRICT JUDGE, WITHIN

TEN (10) DAYS after being served with a copy hereof.

SO RECOMMENDED this 12th day of August 2005.

S/ G. MALLON FAIRCLOTH
UNITED STATES MAGISTRATE JUDGE